Case number 20-1030, et al. D.H. Long Point Management LLC petitioner versus National Labor Relations Board. Mr. De La Quil for the petitioner, Mr. Hickson for the respondent. Good morning, your honors, and may it please the court. I'm Mark De La Quil arguing on behalf of the petitioner, which I'll call Teranea Resort after the name of the property. There were three fundamental mistakes in the board's decision that merit granting the petition for review in this case. The first was the board's failure to consider significantly similar precedent concerning when kitchen managers constitute 211 supervisors under the National Labor Relations Act. Teranea raised this precedent and its exceptions to the board and the board did not address it at all. Under this court's decisions, including Brusco Tug and Lemoyne-Owen College, that merits granting the petition. Separate and aside from the board's failure to consider its precedents, its decision that Mr. Lovato was not an NLRA section 211 supervisor was unsupported by substantial evidence. And third, the board's decision that Teranea's discipline of Mr. Lovato was motivated by animus cannot be supported because it is materially based on consideration of imputed animus from the president of Teranea to the actual disciplinary decision makers under circumstances that this court has held were not appropriate in its flagstaff decision. Turning to my first argument that the board ignored its precedents, over the years, the board has had occasion to consider when kitchen managers constitute 211 supervisors on numerous occasions. Most notably, in the Piccadilly Cafeteria's case, the board determined that an assistant chef and a relief chef constituted 211 supervisors despite the fact that they did not prepare the recipes, they had no input over the menus, and they had no input over work schedules where those cooks directed their subordinate cooks for a substantial portion of their shifts, even though the head chef frequently exercised overall supervision. And the board made that decision because it concluded that the preparation, timing, and presentation of dishes and ensuring that those were prepared correctly and appealingly required the exercise of independent judgment. Each of those considerations applies equally to the case of Barr. Mr. Lovato was in charge of the kitchen frequently, generally from eight to 10 to 30. During that time, he had authority to direct the chefs who worked under his supervision. And there's no dispute in this case that Mr. Lovato had the authority to direct those cooks. And as well, he also had responsibilities reorganizing the kitchen, dismissing employees when the workload was insufficient, training and ensuring that the line was prepared. Under this court's decisions in Brusco, Tugg, and Lemoyne-Owen, when a party raises a precedent to the board and that precedent is significantly similar to the case at Barr, the board is required to discuss it and explain why it's reached a different decision. The board did not do so at all in this case, and that merits granting the petition. In response to this argument, the board's primary position was that Piccadilly cafeterias was outdated in light of the NLRB's subsequent decisions in Oakwood and the Supreme Court's decision in Kentucky River. But that raises a Chenery problem. If the board believes that Piccadilly, Pioneer Hotel, and the other cases that the employer cited are no longer good law, or that they should be afforded less weight, it should be the board making that explanation, not the general counsel in litigation. Second, and apart from the board's failure to consider whether Mr. Lovato considered the Piccadilly case and the other applicable precedent about kitchen managers, its decision that Mr. Lovato was not a 211 supervisor is unsupported by substantial evidence. There are three elements that the employer needs to meet in a case like this to show that an employee is a 211 supervisor. The first is that he has the authority to direct subordinate employees. The second is that he exercises independent judgment. And the third is that he may be held accountable for his supervision. In this case, there is no dispute as to the first element. While the chef de cuisine and the sous chef were out of the kitchen, Mr. Lovato was a junior sous chef, inspected the dishes prepared by subordinate chefs to make sure that they were prepared correctly, prepared in a timely manner, and that if they were incorrect, they were redone. He often acted as an expediter directing the kitchen in that way. He trained and monitored interns and reorganized the line. The second consideration is independent judgment. And on this ground, the board erred because it found that Mr. Lovato did not exercise independent judgment because he did not make the menu. He did not write the recipes. But in Piccadilly, which I discussed earlier, that wasn't what the board considered relevant for independent judgment. What the board considered relevant for independent judgment was whether the kitchen manager ensured that the dishes were prepared in a timely, appealing, and proper manner. And that's what Mr. Lovato did. The third prong is the accountability prong, which under Oakwood requires that the employer prove that there is a prospect of adverse consequences for a supervisor's failure to supervise. And this is a classic substantial evidence problem where the record as a whole simply does not support the board's decision. Mr. Lovato's performance reviews in 2011 and 2015, those are located at JA 540 and JA 532, both noted that Mr. Lovato lacked leadership and needed improvement. Performance reviews for another junior sous chef, Mr. Santos, also graded the junior sous chef on leadership. In May of 2018, within a few months of the alleged- Excuse me, can I pause? I wanna think a little bit more about this Chenery problem that you're talking about. So in Oakwood, didn't the board say that it was establishing a definition for the first time with respect to responsible direction? And didn't it say that with respect to independent judgment, didn't it say it was changing the definition in response to Kentucky River? And in Brusco, didn't we say that pre-Oakwood cases therefore had limited presidential value? I'll take all three of those in turn. On the question of responsible direction, it is fair to say that the board established a new precedent. And we believe for the reasons described earlier that we met it, and we also believe- Does that mean that with respect to the prior cases, they are of limited presidential value and there's no reason for the board to have to say that again, is there? Well, I think there is a reason, at least under the facts of this case, because there is also the question of what the independent judgment that the board should be considering was. And this gets to the question of independent judgment. In Kentucky River and Oakwood, what happened was the Supreme Court found that the NLRB standard for a 211 supervisor status was too stringent and that some employees who ought to be found to be 211 supervisors were incorrectly found not to be because of the board's categorical carve out of ordinary professional and technical judgment. So you essentially had too many type two errors. In Piccadilly, there was a finding that the employees were statutory supervisors. So as to independent judgment, that error did not infect and could not have infected the Piccadilly decision. And on the question of what independent judgment means for a kitchen manager, whether it means do you write the menu or whether it means do you make sure that dishes are prepared properly, appealingly and in a timely manner, Piccadilly is on all fours and needed to be considered. Third, turning to Brusco Tug, I believe what the board or what this court, excuse me, actually said in that case was that the board considered its pre-Oakwood decisions and that it found there that they were of limited precedential value with an explanation. And if that is going to be the outcome in this case, it's something that the board needs to consider on its own. It's not something that the general counsel ought to be raising in litigation. Does the board have to say it again and again or isn't it enough to say once? I think the board does need to say it if there is a significant showing and that's the test from Lemoyne-Owen that a pre-Oakwood decision has application to this case. And again, I don't think that we would need to or want to argue for a categorical rule that anytime a party finds an arguably applicable pre-Oakwood precedent that the board has to go and explain yet again, no, Oakwood changed the law. But where there's an aspect of a pre-Oakwood precedent that does appear to be on point as Piccadilly is on independent judgment and the party raises it for board, then I think the onus is on the board to explain why that aspect of the decision was not inconsistent with Oakwood. And in this respect, Oakwood in this independent judgment discussion does cite at least one pre-Oakwood decision of the board as correctly stating its position. So it's not as if Oakwood swept away everything that existed before it. And that gets me also to the responsibility to direct prong, which you mentioned. The record evidence is ample that Mr. Lovato had responsibility to direct. I mentioned the two performance reviews. I want to mention two other items. In May, 2018- Can I just interrupt for one second before you go on to that point? I didn't see this Chenery argument made until your reply brief as far as, I guess you've made it in your reply brief in response to the government's, I'm sorry, the board's brief that there is a Chenery problem here if we accept the general council's explanation, but you don't say that there's a Chenery problem in your opening brief in general with respect to how the board decided this case. I'm just trying to understand your argument here with Piccadilly. Sure. How it transpired is in our exceptions to the board, we raised Piccadilly on the 211 supervisor status question. The board never mentioned it in its decision, which is the situation that we believe led to a Lemoyne-Owen and Brusco-Tug problem. And we cited Brusco-Tug on this issue in our opening brief. In response, the NLRB said, well, we didn't need to say anything about those decisions because Kentucky River and Oakwood were correctly straight the law and these were pre-Oakwood decisions. And in response to that, in our reply brief, we said, no, that's a Chenery problem. If the board believes that Piccadilly no longer accurately states the law or has less precedential value than it used to, then it needs to be the board that says that. And that's where the Chenery problem came from. If the NLRB's brief was entirely silent on this issue, they would still have the arbitrary and capricious problem for Brusco-Tug, but they wouldn't have the Chenery problem. It's not like the board's decision in this case said, no, Piccadilly is not good law because of Oakwood. The board never said that. The board never even mentioned Piccadilly. So I think it's pretty typical in that respect to raise a Chenery argument in reply. I see, okay, I understand you, all right. And given responsibility to direct, in May, 2018, within a few months and in the same month of one of the allegedly retaliatory disciplinary incidents, Mr. Lovato was put on a performance improvement plan in part due to his lack of leadership. And in July of 2018, he was counseled and warned of discipline due to his lack of leadership. And this is at JA 397. And it says that the chef de cuisine is writing, quote, to note the disciplinary actions that may transpire from these issues if the behavior continues. As she goes on to say, quote, Mr. Lovato's performance has been a cause for concern with the lack of leadership. Quote, Mr. Lovato is lacking any kind of initiative to guide the team in any sort of fashion. Quote, after explaining my expectations, which included Mr. Lovato taking the lead in the station, he works, assists in organizing the team and assisting guiding the interns. This is substantial evidence in support of a finding that there was a prospect of adverse consequences to Mr. Lovato as a result of his failure to supervise. And- Are there any evidence of actual or of actual consequences for any sous chef being held for, junior sous chef being held responsible for the performance of others? The record indicates that the witnesses were unable to provide on the stand any examples of junior sous chefs being disciplined for failing to show leadership, but- I didn't ask about show, I'm not sure what showing leadership means. What I'm asking is, although that's yet another point, I'm actually showing being held responsible for what somebody else does. The witnesses were unable to identify any such discipline. However, I would argue in this case that the absence of evidence is not evidence of absence. And I would also argue that the- Before you, let me just get the facts right. There are nine kitchens in the resort. And so at least nine sous chefs, is that right? That's right. One sous chef, a kitchen. And the absence of any time in history for any of those nine or any of their predecessors or successors to ever being held responsible, that's not evidence of absence? Not unless it was accompanied by evidence that there was another sous chef who displayed the continued lack of supervision of the line that you've seen with Mr. Lovato. And there was no evidence that there was any other junior sous chef, the Terranea, who had that same continual failure to supervise subordinate chefs. And I would note- Sorry, I'm having a question about the continuing failure to supervise. You used the word leadership. Does it say failure to supervise in the forms you're talking about? And does it say, give an example of a failure to supervise? Well, I would note, if I turn to the disciplinary, not disciplinary, counseling memo warning of disciplinary consequences on JA 397, it says, Mr. Lovato is lacking any kind of initiative to guide the team in any sort of fashion. It also says, we ended the conversation with the hopes that Mr. Lovato will be able to provide leadership guidance and quote unquote supervision to our team at the capacity of a junior sous chef. But does it hold him accountable for anything that somebody on the team did or didn't do? There was no circumstance like that, was there? Well, there was the macaroni and cheese incident. And I want to turn to that briefly. I understand that the board found that the discipline was retaliatory. However, I don't understand the NLRB to be arguing that no discipline was appropriate for Mr. Lovato when he failed to supervise Mr. Flamenco in preparing what was supposed to be gluten free  and instead sending a macaroni and cheese with a roux containing flour to sicken a child. That would be- Was it not correct that a week earlier, no one had been disciplined for serving a gluten containing pizza that sent a child to this hospital? That is correct, but I don't think that the instances are sufficiently similar. And let me tell you why. What is called by the parties, the pizza incident in May 19th of 2018 was the first in the record food allergy incident at Terranea. And as a result of that, a new procedures and emphasis on food allergies were adopted, including Ms. Guerrero in the in-room dining kitchen who was the chef de cuisine, going over the standard operating procedures for food allergies at the beginning of every shift. Then six days later on May 25th, 2018, you had the macaroni and cheese incident when the macaroni and cheese that was supposed to be gluten free went out of the kitchen while Mr. Lovato was in charge. And there's no dispute that he was in charge when that dish went out. Given the close proximity, and I would also direct the court to the emails from that investigation, which are at joint appendix 388 to 392. It's very clear that Ms. Guerrero and Mr. Ibarra, who was the head of culinary operations at Terranea as a whole, were concerned about this lack of leadership that let the macaroni and cheese go out. And the chef or the cook, I'm sorry, who prepared it, Mr. Flamenco was given a written warning and Mr. Lovato was given a final written warning. And the company has argued because he was the supervisor and that it made sense to put the onus on him, particularly in light of a similar incident in some respects in close proximate time. I understand the NLRB to be arguing that the level of discipline Mr. Lovato received was retaliatory. And I believe the board did find that. And that's what one of the things that's being reviewed today. But I don't think that the NLRB has or can argue that it was inappropriate to put consequences on the supervisor who allowed that dish to leave the kitchen when it never should have left the kitchen. Thank you. That's a real discipline. Yeah, so you've just spent a huge amount of time on the mac and cheese incident. And in fact, your blue brief devotes many pages to it. But Lovato was fired after the chicken wings incident. And I didn't see any place in the blue brief where you challenged that until your reply brief. And the board actually argues that you forfeited that. I think that that goes, I didn't mean to interrupt Judge Tatum. No, I'm done, sorry. Okay. Well, I think that goes to the procedure of this case. I don't understand the NLRB to be arguing, and perhaps Mr. Hickson will disagree with me, that it was inappropriate to discipline Mr. Lovato for the macaroni and cheese incident in some respect, or to discipline him for the fried chicken incident in another respect, in some respect. I understand the NLRB to be arguing that the ultimate termination was unlawful, and that the reason that he was discharged after the fried chicken incident was because there was a final written warning in the macaroni and cheese incident. And so if that final written warning in the macaroni and cheese incident was non-retaliatory, as we contend that the insubordination at the very least in the fried chicken incident, where Mr. Lovato ignored a direct instruction from Ms. Guerrero to discard chicken that he had rinsed in water, would allow termination. Do you make this point in the brief? We do. I believe this is made at the very end of the brief. Thank you. Your Honor, I'm not seeing it right now, but I will get back to you on that. Okay. Well, you're out of time, unless Judge Garland or Judge Wilkins, do either of you have any further questions? No, thank you. We'll hear from the board. Mr. Hickson. Good morning, Your Honors. May it please the court. I hope you can hear me well. My apologies. I'm sorry, Your Honor. Nevermind, just go ahead. Okay. Excuse me, Your Honor. And I apologize for something you didn't hear me say, so we'll just move on. Okay. Good morning. May it please the court. Michael Hickson for the NLRB, seeking full enforcement of the board's order in this case. The question before the court is simply whether substantial evidence on the record supports the board's determinations that the company, excuse me, that the company failed to prove Mr. Lovato's supervisory status and that it unlawfully disciplined and discharged him because of his prominent and extensive protected activities. This court has consistently recognized that board findings regarding both supervisory status and unlawful motive are entitled to special deference beyond the already high level of deference that substantial evidence review mandates. And here, the record amply supports the board's findings on both questions and the court should therefore grant enforcement. The discussion so far today, it seems has focused on the 211 supervisory status issue. So I guess I'll plan to address that first. Go straight to the question about Chenery and the board not expressly addressing Piccadilly cafeterias and some other cases in its decision. I think that the law of this court is clear that when the basis for distinguishing a case is readily apparent, that it is not necessary that the board expressly address that case in its decision. And as we set forth in our brief, the pre-Oakwood, pre-Kentucky River cases that the company relies upon are readily, it is readily apparent that their distinction and how they're not applicable here and would be of only the most limited precedential value because they perceive the Supreme Court's decision in Kentucky River and the board's subsequent decision in Oakwood. And there, as was discussed between Judge Garland and my colleague, the Supreme Court and the board made very significant holdings and the board guided by the Supreme Court's determination with respect to independent judgment revised, substantially revised and changed the standard as to independent judgment. So these pre-Oakwood cases do not apply the controlling legal standard that my opponent agrees is the controlling standard. We know that because not only does Piccadilly cafeterias, for example, not only does that case proceed both Oakwood and Kentucky River, the case actually sets forth no standard of independent judgment. There is nowhere in that decision where any independent judgment standard is identified. And there's frankly no independent judgment analysis to speak of in that case. The judge seems to have simply assumed that these assistant chefs responsibilities would require independent judgment, but without explaining why, without setting forth any legal standard. The case also fails to recognize as do all of the cases that our opponent cites. It fails to recognize that the party is starting supervisory status, bears the burden of proof, a point that the Supreme Court upheld in Kentucky River. And that since Kentucky River, the board has been very consistent in emphasizing. And furthermore, nothing in that decision, Piccadilly cafeterias or any of the other decisions contain anything in the way of specific examples. As this court has said, for example, in a Vista court, a post Oakwood case, what the statute requires is evidence of actual supervisory authority visibly translated into tangible examples demonstrating the existence of supervisory authority. And the court emphasizes this again, for example, in Manson terminals, it talks about how there must be specific examples in the record. These pre Oakwood cases, pre Kentucky River, pre Oakwood cases that the company cites contain no such discussion of any examples. So there is no Chenery problem. No problem. Well, there's just no problem with the pre Kentucky River cases because it's readily apparent that they're distinct. Again, the court has said this in prior, both the board and the court have made this court and other courts, including this court in Brusco Tug, the first circuit in NSTAR, the fifth circuit in Entergy Mississippi have repeatedly recognized that Kentucky River and Oakwood materially and importantly changed the standard. And that therefore any prior decisions are of limited value. So there is no need for the board to address them here. I would just point out that in Brusco, yes, the board addressed cases there, but first as Judge Garland raised the question, how many times does the board have to do that over and over again? And secondly, situation was a bit different there because there the case was actually on remand from this court's 2001 Brusco Tug decision, which was issued prior to Kentucky River. And in the remand, the court asked the board to address these cases, but that remand was issued by the court prior to Kentucky River and Oakwood. So here the company failed simply to meet its evidentiary burden to prove that Mr. Lovato exercised independent judgment and also proved that he was, failed to prove that he was accountable for other kitchen workers' performance. With respect to independent judgment, you know, I think the company presents the menus and the recipes as if the board made a finding that Mr. Lovato had to exercise some kind of artistic creativity or something, but that's not why the board found the evidence important. It found the evidence important because as the Supreme Court itself emphasized in Kentucky River and the board in Oakwood and as subsequent cases have held, if a putative supervisor's discretion is significantly controlled or constrained by pre-established detailed instructions issued by the employer, then that does not show independent judgment. And that's what happened in this case. Mr. Ibarra, for example, testified that the menus and recipes were very comprehensive, thorough, finely tuned, and highly precise standards and instructions. And Mr. Lovato did not have discretion to deviate from those instructions. So in that respect, the company failed to show independent judgment. I did want to address one factual point that was mentioned by my colleague, which is he asserted that Mr. Lovato often acted as an expediter. That is simply not the case. The record shows that it was on very rare occasions, extremely rare occasions, that Mr. Lovato had ever acted as an expediter. The evidence shows that the vast majority of the time he was simply a member of the line cooking at his station alongside the other cooks on the line. And he was responsible at all times for performing, well, for preparing, I should say, the dishes that came in on the tickets that were to be prepared at his station. So I would just emphasize too, that of course, both independent judgment and responsibility or accountability under the statute, these are both mandatory requirements. So if the court affirms the board on one of them, the court must uphold the board's supervisory determination. We, of course, maintain that substantial evidence supports the board's findings, both on accountability and independent judgment. But I did just want to emphasize that point. With respect to the evidence that the company puts forth on accountability, it claims that Mr. Lovato was subject to eventual discipline based on other cooks' performance. But it's undisputed that apart from the macaroni and cheese incident, which is deficient evidentiarily for its own reasons, that the company had never before in the history of any of its more than nine kitchens issued any level of discipline, even the lowest possible level of discipline to any of its junior sous chefs based on another cook's performance or failure to correct another cook's mistake. And more generally, the only evidence that the company put forward was simply too vague, too conflicting, and too conclusory to satisfy its evidentiary standard under the precedence of the board and this court. I'd like to highlight, I guess, that when my colleague was asked about actual discipline and whether there was any evidence of it, there is none except for the macaroni and cheese incident, which I can address if your honors would like. But my colleague said that it was that merely that the witnesses on the stand could not on the spot recall an instance. But it's much broader than that, your honors. It's that the company walked into the hearing knowing that it was going to assert this defense and that it is its burden to prove this defense that Mr. Lovato was a statutory supervisor under section 211. So it's not as if the witnesses were caught off guard, and it's not as if the company showed up to the hearing not knowing that section 211 supervisory status was going to be an issue. It came to the hearing knowing that it was going to put on this defense, that it was its burden to prove the defense, and it came up with nothing in the way of actual discipline, again, aside from the macaroni and cheese incident. So it's not just the witnesses on the stand. It's the company's overall failure to meet its burden. With respect to the macaroni and cheese incident, it's deficient, number one, because it was discriminatorily motivated. I mean, you can't prove a putative supervisor's 211 status. You can't meet that burden in reliance on discriminatorily motivated adverse action. That's the first reason. And in any event, even setting that reason to the side, the evidence is too conclusory to satisfy the company's burden because it is undisputed that one of the decision makers, Ms. Kwok, she participated in the collective decision to issue discipline against Mr. Lovato, and she understood that Mr. Lovato had directly worked on the dish, not just that he had been present in the kitchen and failed to catch someone else's error, but that he had actually put his hands on that dish. And she understood that was part of the basis for the discipline. She was one of the three managers who made the collective decision that some discipline would be issued, and she was the person who drafted the disciplinary notice. So in those circumstances, the evidence is too conclusory to satisfy the company's evidentiary burden. The company also mentioned the performance assessments as the board found, and similar to the performance assessments and evaluations that were addressed by the Sixth Circuit in Frenchtown and by the board in Golden Crest Healthcare, mere negative comments appearing on a performance evaluation are not enough to show more than a speculative risk of material adverse consequences. I mean, in Frenchtown, the evaluations of the nurses in that case talked about, used language about leadership and about, quote, supervision. And in Golden Crest, the evaluations addressed by the board evaluated nurses on how well they directed CNAs. And the board and the court respectively, in those cases, found that those critical comments or comments about areas to improve performance were not enough to show a non-speculative and real risk. And it's true that it need only be a material, a prospect, but a prospect of material adverse consequences, but the company must prove that prospect and must prove that it's real and non-speculative and not simply hypothetical. Excuse me. With respect to- I'm sorry, just so I get this, the JA site that opposing counsel raised, JA 397, is that what you're talking about or is it something else? That's the memo to file about, starts by saying I'm writing this not as a disciplinary notice, but to clarify some concerns and discuss as leadership. Is that what you're talking about or something else? No, well, I wasn't specifically talking about that, Your Honor, although the response is somewhat similar. I was talking about the assessments given to Mr. Lovato in 2011, 2015, and May, 2018. The May, 2018 assessment, the company calls a performance improvement plan. As the board points out in the footnote in the decision, there's no actual title on the document. Ms. Guerrero did refer to it as a performance improvement plan in her testimony, though she also called it an evaluation. And in any event, regardless of the title applied to that document, it's really not material, regardless of what you call it. It's just not sufficient. What about the memo at JA 397 that he was citing? Sure, sure. That's the July memo memorializing a conversation between Guerrero and, excuse me, Lovato. On that, the board reasonably found that the evidence was just too vague and inconclusive to establish that Mr. Lovato, one, was being disciplined for his own performance, as opposed to an error made by another kitchen employee, because that's what the statute requires, as this court has recognized. For example, in the Allied Aviation case, it has to be the putative supervisee's error for which the putative supervisor is being disciplined, not the putative supervisor's own error. And for example, the memo itself talks about his performance, and Ms. Guerrero, in her testimony about the memo, talks about his performance and his station, referring to Mr. Lovato. And otherwise, the memo, both the memo and Ms. Guerrero, as she was questioned on the standby counsel, had the opportunity to really flesh out what happened on this night with this, quote, disorganized evening of service. And she just failed to do so. She failed to provide the kind of specific detailed evidence that the board and the courts require in order to show accountability under that. It seems like it goes a little bit beyond his own performance. It says it played a role. Freddie is lacking any kind of initiative to guide the team in any sort of fashion. It does say that, Your Honor, but I would submit respectfully that it's just very vague in terms of what that really means and what happened that night. And it's just the company's burden to show by specific and detailed evidence. That's what the board and this court require. And perhaps that could have been fleshed out by Ms. Guerrero on the stand. Instead, when she was questioned and testified, she failed to do so. And so it's both inadequate in terms of establishing that it's his performance versus the performance of others. And it's also inadequate in terms of establishing an actual risk, an actual risk of non-speculative risk of adverse consequences in that it's akin to the educational inservices that were given to the nurses in Frenchtown. Ms. Guerrero and Mr. Rivara characterized the conversation as just a coaching or a counseling for Mr. Lovato to learn. And so it's akin to the evidence in that case, which the court held insufficient. I do see I'm over my time, Your Honors, and I'm very happy to answer any and all questions the court may have for me, but I don't want to be out of time. Any other Judge Carlin or Wilkins? No, no, thank you. Okay, thank you, sir. Thank you, Mr. Delacroix. Mr. Delacroix, you were out of time, but you can take one minute. Thank you. First, I'd like to respond to the citation, Judge Tatel, of us making the argument. And I'd switch you to, on page 18, the first sentence of the point two in our summary of argument, NLRB's brief, page 58, note 10, which discusses the party's shared understanding of the relative roles of the macaroni and cheese and the fried chicken incidents. Second, I want to clarify that I intended to state that Mr. Lovato was in charge of the kitchen from roughly from 8 to 10.30 every day, not that he expedited for that entire time. If I misspoke, I apologize. And third, I want to address briefly the responsible authority. The NLRB has made much of the inability of our witnesses to come up with an example of similar discipline. But what that really does is attempt to restrict the evidence you can use to prove responsible to direct. The folks who discipline in the Terranea kitchens are cooks. They make food. They're not lawyers. They don't make paper, but they still had noted Mr. Lovato's supervisory failures in his 2011 and 2015 performance reviews. In the May 2018 performance improvement plan and in the July 2018th memo, warning of disciplinary consequences in his leadership. And so- Mr. Delacroix, you're over your time. Just finish up quickly, please. I'll stop there, Your Honor. Thank you. Thank you. Thank you both. The case is submitted.
judges: Tatel, Garland, Wilkins